
# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

In re

MAUI INDUSTRIAL LOAN &
FINANCE COMPANY, INC.,

     Debtor.

DANE S. FIELD,

     Plaintiff,

   vs.

DENNIS I. HINAHARA and MYRA
S. HINAHARA,

     Defendants.

Case No.: 10-000235
Chapter 7

Adv. Pro. No. 12-90009

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

   In this adversary proceeding, the bankruptcy trustee of a company that

operated a Ponzi scheme seeks to avoid and recover certain transfers to the

defendants.

   I granted partial summary judgment in favor of the defendants, ruling that the

trustee may not recover transfers made more than two years before the bankruptcy

filing under Bankruptcy Code § 548 (Count Four of the complaint).[1]

I granted partial summary judgment in favor of the trustee on the trustee's case in chief on Counts One, Two, and Three of the complaint. Specifically, I ruled that (i) the transfers to the defendants were made with actual intent to hinder, delay, or defraud creditors under Hawaii Rev. Stat. § 651C-4(a), (ii) the defendants are "initial transferees" under Bankruptcy Code § 550(a)(1), and (iii), if the trustee prevails, the trustee will be entitled to prejudgment interest at the state statutory rate from the date of each transfer to the date of judgment.[2]

A trial was held on the defendants' affirmative defense of good faith and value. At the trial, Bradley Tamm and Lissa Shults represented the trustee, and Dana Lyons and Ryan Hamaguchi represented defendants Dennis and Myra Hinahara.

I recommend that the district court adopt the following proposed findings of fact and conclusions and enter judgment in favor of the trustee in the amount of $52,729.75 plus pre-judgment interest from March 10, 2014 to the entry of judgment.

In summary, the defendants took the transfers in good faith. They did not know that the debtor made transfers to them with the intent to hinder, delay, or defraud its creditors. A reasonable creditor in the defendants' position would not have suspected the debtor's fraudulent intent until February 2009. A creditor who attempted to investigate those suspicions would have learned nothing.

Further, the defendants gave value to the debtor in an amount equal to their

---

[1]Dkt. 66.

[2]Dkt. 81.

2

deposits with the debtor.

Therefore, the trustee is entitled to recover the transfers to the defendants minus the amount of their deposits, plus prejudgment interest.

## PROPOSED FINDINGS OF FACT

### I.    The Parties and Their Relationships

1.      Plaintiff Dane Field is the duly appointed, qualified, and acting trustee in bankruptcy of Maui Industrial Loan & Finance, Inc., debtor. Maui Industrial Loan & Finance, Inc., sometimes did business as Maui Finance Co. and will be referred to herein as "MFC."

2.      MFC was licensed under Hawaii law as a "nondepository financial services loan company." [3]It engaged in the business of making loans. Hawaii law forbids nondepository financial services loan companies from accepting deposits from the public.[4] MFC ignored this prohibition[5] and accepted millions of dollars of deposits from dozens of depositors.[6]

3.      Beginning in 1985, Lloyd Kimura was the principal owner and the person in control of MFC. Kimura was also a certified public accountant practicing in Maui. Lloyd Kimura is married to Jenny Kimura.

4.      Defendants Dennis and Myra Hinahara are husband and wife and

---

[3] Ex. 80.

[4] Haw. Rev. Stat. § 412:9-500.

[5] Ex. 80.

[6] *See* the claims register in case number 10-00235.

3

residents of Maui.[7] Mr. Hinahara is an experienced and sophisticated business person and real estate investor.[8] He has had a long and successful career in the real estate escrow business.[9] Mrs. Hinahara was a high school social studies teacher until she retired in 2004.[10] She has little experience with business or investments.[11] Until her retirement, she relied almost entirely on her husband to manage the family finances. After her retirement, her involvement in the finances increased, but she still relied primarily on her husband.[12] Her reliance on her husband was reasonable.

5.     The Hinaharas met Lloyd Kimura in the early 1980s.[13] A while later, the two couples became social friends and the Hinaharas retained Kimura's accounting firm to prepare their tax returns.[14]

6.     Lloyd Kimura was (at least until late 2009) a well-respected business person, accountant, and member of the Maui community.[15] Many people on Maui trusted him, did business with him, and lent funds to MFC. Lloyd Kimura's reputation encouraged the Hinaharas, and would have encouraged a reasonable

---

[7] Dkt. 143 at 59-60.

[8] Dkt. 145 at 55.

[9] Dkt. 144 at 90-92.

[10] Dkt. 143 at 62-63.

[11] Dkt. 143 at 61-62.

[12] Dkt. 143 at 81-83, 102-03, 123; dkt. 144 at 20-21.

[13] Dkt. 144 at 92-93.

[14] Dkt. 143 at 69-71; dkt. 144 at 93-95.

[15] Dkt. 143 at 104, 109; dkt. 144 at 95-96.

4

person in the Hinaharas' position, to trust Kimura and to believe that he and MFC were solvent and operating properly.

7.    Unbeknownst to the Hinaharas, beginning in the late 1980's, Kimura began to operate a Ponzi scheme. He induced individuals (many of them his accounting clients) to invest money with him or MFC. He often represented that MFC was a bank or savings and loan business that made loans at high interest rates, usually 18% to 24%, and that were secured by collateral. He promised the investors interest at rates usually ranging from 8% to 12%. He collected millions of dollars from many investors in this fashion. Contrary to his promises, he usually did not use the investors' funds to make loans, but instead used them to finance his personal businesses and investments, to maintain his personal lifestyle, and (in order to maintain the perceived legitimacy of his business) to pay earlier investors their promised principal and interest. He also generated false monthly statements and tax returns to convince investors that he was using their funds as promised. In order to generate some of the cash needed to keep the Ponzi scheme afloat, he fraudulently obtained bank loans and looted his accounting firm's retirement plan accounts.[16]

## II.    The Hinaharas' Loans to MFC

8.    The Hinaharas (sometimes Mr. Hinahara alone, and sometimes with his wife) transferred cash to MFC as follows:[17]

---

[16] Ex. 1.

[17] Ex. 71; dkt. 148 at 27-28, 30, 33-35; ex. GG.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 5 of 72

| Date | Amount |
|---|---|
| 9/24/1990 | $100,000.00 |
| 11/17/1997 | $40,000.00 |
| 12/26/1997 | $90,000.00 |
| 12/18/1998 | $50,000.00 |
| 1/4/1999 | $40,000.00 |
| 6/21/2000 | $28,900.00 |
| 4/15/2002 | $64,000.00 |
| 6/15/2005 | $35,000.00 |
| 10/11/2005 | $65,000.00 |
| 1/4/2006 | $123,250.00 |
| 6/26/2007 | $300,000.00 |
| TOTAL | $936,150.00 |

9.     MFC referred to the deposits from the Hinaharas and other victims of the Ponzi scheme as "Notes Payable."[18]  Each of these transfers was received in the usual course of MFC's business, and (with the possible exception of the coordinated loans described below) MFC gave credit to the Hinaharas for each of them against the equivalent of a savings account.[19] Mr. Hinahara thought of them as "deposits" in a savings account.[20]

10.     The Hinaharas contend that they made additional deposits with MFC. The evidence does not support this contention. (The Hinaharas made other transfers

---

[18] Ex. 69.

[19] Dkt. 145 at 8-10.

[20] Dkt. 145 at 46-47; dkt. 148 at 29, 46, 50.

6

to Kimura, but those transfers are irrelevant for the reasons explained in the conclusions of law.)

11.  When the Hinaharas made each of these deposits, they acted in good faith. They did not know, and a reasonable person in their position would not have known, that MFC could not legally accept their deposits,[21] that Kimura or MFC was insolvent or were operating a Ponzi scheme, or that Kimura or MFC were making transfers with the intent to hinder, delay, or defraud their creditors.[22]

12.  MFC regularly paid the interest due to the Hinaharas on the deposits. On some occasions, the interest payments were a few days late.[23]

## III.  Joint Investments

13.  Over the years, the Hinaharas made many investments with the Kimuras. These investments took several forms.

14.  Beginning in 1988, the Kimuras and the Hinaharas jointly purchased interests in numerous parcels of real estate. Some of the properties were acquired by Kimura and Mr. Hinahara; some investments included one or both of their wives; and some included other unrelated people.[24]

15.  Each of these joint investments in real estate was an association of two or more persons to carry on as co-owners a business for profit.[25]

---

[21] Dkt. 144 at 109-10.

[22] Dkt. 144 at 110, 117-18; dkt. 145 at 8.

[23] Dkt. 144 at 116-17; dkt. 145 at 7, 12-16.

[24] Ex. 13-16, 23, 28-36, 38-40, 42, 44; dkt. 147 at 77-79.

[25] *See, e.g.*, dkt. 145 at 68-69, 76, 79-82.

7

16.     Beginning in 1989, the Hinaharas and the Kimuras formed, owned, and served as the officers, directors, or managers of several corporations and limited liability companies. Mrs. Kimura and Mrs. Hinahara were involved in some but not all of these companies. Third parties were also involved in some of them.[26] Almost all of these entities were formed to invest in real estate. None of them were in the money lending business (although some of them did make deposits with MFC).[27]

17.     Most of the joint investments and companies of the Hinaharas and the Kimuras were successful and profitable.[28]

18.     The Hinaharas and their fellow investors agreed that Lloyd Kimura would manage the day-to-day affairs of each of these joint investments and companies. He kept the books, dealt with the tenants, collected the rents and other income, paid the expenses, and arranged for the routine upkeep of the properties. He did not have authority to make major decisions, such as the sale or purchase of property, without the consent of the other investors.[29]

19.     The Hinaharas' returns on the joint investments and companies were distributed to them by checks made payable to one or both of the Hinaharas. As a convenience to the Hinaharas, Kimura took the Hinaharas' checks directly to the bank and deposited them in the Hinaharas' account. The Hinaharas agreed with this

---

[26] Ex. 8-12.

[27] Ex. 24-27, 41, 43, 45-47.

[28] Dkt. 145 at 91.

[29] Dkt. 145 at 96-97; dkt. 147 at 9, 42-45, 104; dkt. 148 at 82-84.

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed  07/11/14  Page 8 of 72

procedure and gave Kimura some deposit slips on their accounts.[30]

20.  The Hinaharas were generally satisfied with Kimura's handling of his management responsibilities. Two incidents raised some concern:

a.  From time to time, Mr. Hinahara received telephone calls or notes from banks stating that the bank accounts for the Hinaharas' business ventures with Kimura were overdrawn. The overdrafts were small and Kimura quickly covered them.[31]

b.  During 2005, Mrs. Hinahara became concerned about the amount of money the Hinaharas were paying toward a property they co-owned with the Kimuras (the Kahekili property).[32] Mrs. Hinahara wondered whether the expenses were inflated and whether Kimura was paying his share. Kimura explained that the expenses were high because the property was being renovated. He produced receipts to justify the expenses and made contributions so the Hinaharas and the Kimuras had paid equal shares of the expenses.[33] The Hinaharas were satisfied, and a reasonable person in the Hinaharas' position would have been satisfied, with Kimura's explanation and conduct.[34]

21.  In mid-2006, Mr. Hinahara and Kimura signed an agreement to buy a property known as 81 Hale Kuai from KK7, LLC. Mr. Hinahara agreed to the deal

---

[30] Dkt. 147 at 45, 59; dkt. 148 at 84.

[31] Dkt. 147 at 18-24; ex. 74; dkt. 148 at 136-40.

[32] Dkt. 147 at 89; dkt. 144 at 49-56; dkt. 145 at 29, 31.

[33] Dkt. 144 at 49-56; dkt. 145 at 32.

[34] Dkt. 147 at 93, 95-96; dkt. 144 at 49-56; dkt. 145 at 33-34, 37-38.

9

based on Kimura's representations. In July 2006, after he signed the agreement, Mr. Hinahara learned that the property was not as Kimura had represented: the buildable area of the parcel was smaller than Kimura had represented; part of the parcel was wetlands which could not be developed; Kimura, not KK7, had title to the property; and the shoreline management area permit expired before the sale closed. Mr. Hinahara elected to cancel the transaction.[35] Later, Mr. Hinahara was sued as a result of the failed transaction, but Kimura settled the case at no cost to the Hinaharas. By May 2008, this incident made Mr. Hinahara more suspicious of Kimura.[36]

## IV.  Coordinated Loans

22.     Beginning in 2002 and continuing through 2007, the Hinaharas entered into transactions with MFC in which the Hinaharas advanced funds to MFC so that MFC could lend those funds, sometimes along with MFC's other funds, to identified borrowers. (The Hinaharas' loans to MFC are included among the deposits listed in finding of fact 8.) These transactions were documented as loans by the Hinaharas to MFC and separate loans by MFC to the borrowers. MFC repaid the Hinaharas by remitting a share of the payments it received from the borrowers as MFC received them, but MFC was legally obligated to repay the Hinaharas even if the third party borrower did not repay MFC. In some cases, MFC paid the Hinaharas their proportional share of "points" or fees paid by the borrower to MFC.[37]

---

[35] Dkt. 148 at 54-66; dkt. 149 at 45-49.

[36] Dkt. 148 at 65.

[37] Kimura affidavit, *supra* n. 14, ex. 19-21; dkt. 147 at 28-35; dkt. 149 at 15-16, 24.

10

23. These loans were not associations of two or more persons to carry on as co-owners of a business for profit. The Hinaharas did not co-own anything with MFC. Because MFC was obligated to pay the Hinaharas a fixed sum regardless of whether or how much MFC's borrowers paid it, there was no agreement to share profits.

24. One of the coordinated loans is significant for other reasons.

a. In June 2007, the Hinaharas lent $300,000 to MFC. Kimura told Mr. Hinahara that MFC would use that money to fund part of a $400,000 loan to a Mr. Bradbury and Ms. Flood and that Mr. Hinahara's loan would be secured by a mortgage on Mr. Bradbury's and Ms. Flood's property. Shortly before the loan closed, Mr. Hinahara learned from the escrow company (not from Kimura) that the loan was going to be $475,000 and that Mr. Bradbury and Ms. Flood were giving a mortgage only to MFC, not to the Hinaharas. Kimura told Mr. Hinahara that he had not gotten the borrowers to sign a mortgage in favor of the Hinaharas because he (Kimura) was pressed for time. Mr. Hinahara chose to continue with the transaction, even though it was not as Kimura had represented, and even though Kimura's excuse was flimsy, because he believed MFC would repay him.[38]

b. The Bradbury/Flood loan bore interest at fifteen percent per year and was due and payable in one year.[39] The Hinaharas' loan to MFC had the same terms. Mr. Hinahara expected to be repaid when Mr. Bradbury and Ms. Flood repaid

---

[38] Dkt. 145 at 38-43; dkt. 147 at 68-89; dkt. 149 at 25-29.

[39] Ex. 75.

11

MFC, although MFC was legally obligated to repay the Hinaharas regardless. Mr. Bradbury and Ms. Flood repaid MFC in full and on time,[40] but MFC did not repay the principal amount of the Hinaharas' loan. Instead, MFC continued to make interest payments to the Hinaharas.

       c.     In or around June 2008, Mr. Hinahara asked Kimura if Mr. Bradbury and Ms. Flood had repaid the loan. Kimura said that they had not. This was a lie, although Mr. Hinahara did not know that Kimura had lied until later.[41]

       d.     In January or February 2009, Mr. Hinahara learned that MFC had released its mortgage on the Bradbury/Flood property. Mr. Hinahara confronted Kimura with this information. Kimura changed his story and admitted that Mr. Bradbury and Ms. Flood had repaid MFC, but said that he thought the Hinaharas did not want their principal back and instead wanted to continue receiving interest payments. This was a lie and Mr. Hinahara knew it.[42]

       e.     The revelation of Kimura's perfidy came as a shock to Mr. Hinahara. Considering the close relationship that the Hinaharas enjoyed, and the fact that Mrs. Hinahara was friendly with the Kimuras, the inference is inescapable: Mr. Hinahara must have told his wife about this incident.

## V.    MFC's Demise and Kimura's Plea Agreement

       25.     On October 19, 2009, the Commissioner of Financial Institutions made

---

[40] Ex. 76.

[41] Dkt. 147 at 66.

[42] Dkt. 145 at 43-45, 49-50.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 12 of 72

a preliminary finding that MFC was unlawfully soliciting, accepting, or holding deposit accounts and issued a temporary cease and desist order. MFC failed to respond to the temporary order, and the commissioner made it permanent on November 3, 2009.[43]

26.     On January 28, 2010, MFC filed a chapter 7 bankruptcy petition. On the date of bankruptcy, MFC had many unpaid creditors.[44]

27.     Lloyd Kimura was charged in federal court with mail fraud, bank fraud, theft from an employee benefit plan, and other crimes arising out of MFC. On January 5, 2011, he entered into a plea agreement in which he admitted to the facts summarized in finding of fact 7 above.[45]

## VI.    The Hinaharas' Knowledge and Notice of the Ponzi Scheme

28.     At least until the cease and desist order against MFC, the Hinaharas had no actual knowledge or actual suspicion that Kimura or MFC was insolvent, operating a Ponzi scheme, or making transfers with the intent of hindering, delaying, or defrauding their creditors.[46] Indeed, the Hinaharas were among the victims of the Ponzi scheme.

29.     At least until about 2005, a reasonable person in the Hinaharas' position would not have suspected that MFC or Kimura was insolvent, operating a Ponzi

---

[43] Ex. 80.

[44] *See* the claims register in case number 10-00235.

[45] Ex. 1.

[46] Dkt. 147 at 43-44, 95-96, 104-06; dkt. 144 at 67-70, 77-78; dkt. 145 at 16-17.

13

scheme, or making transfers with the intent of hindering, delaying, or defrauding their creditors. The hypothetical reasonable person would have evaluated the available information as follows:

a.    MFC had consistently paid interest on the Hinaharas' deposits when due (or within a few days of the due date). The joint investments the Hinaharas made with the Kimuras were largely trouble-free and generally profitable.

b.    The Hinaharas knew about some of the bounced checks on the accounts for the joint investments, but these were small in amount and Kimura promptly covered the overdrafts.

c.    The Hinaharas also knew that Kimura had sometimes written checks on dual signature accounts without obtaining Mr. Hinahara's signature. Mr. Hinahara reasonably believed, however, that Kimura did this because he was pressed for time, and that all of the checks were for appropriate purposes.

d.    Kimura had been sued a few times, but a reasonable person in the position of the Hinaharas, who was lending money to MFC and making joint investments with the Kimuras, would not necessarily have conducted a full litigation search. Even if the Hinaharas had done a complete search, the nature of the litigation would not have lead a reasonable person in the Hinaharas' position to suspect that Kimura or MFC was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder, delay, or defraud creditors.[47]

30.    Beginning in 2005, more negative information about Kimura became

---

[47] Ex. 48-52.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 14 of 72

available to the Hinaharas:

a. Mrs. Hinahara became concerned about the amount of money the Hinaharas were spending on the Kahekili property.

b. In mid-2006, Mr. Hinahara entered into the 81 Hale Kuai transaction but canceled it after he learned that the property was not as Kimura had represented. In 2008, Mr. Hinahara was sued as a result of the failed transaction. This made Mr. Hinahara more suspicious of Kimura, but the fact that Kimura settled the case at no cost to the Hinaharas would have mitigated a reasonable person's suspicions.

c. The interest rate promised by MFC on the Hinaharas' deposits generally increased, during a period of historically low and falling interest rates, and was higher than the interest they earned on other deposit accounts.[48]

31. A reasonable person in the Hinaharas' position would have evaluated this information along with all of the other available information about MFC and Kimura, most of which was favorable. These pieces of additional information would not have caused a reasonable person in the Hinaharas' position to suspect that MFC or Kimura was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder, delay, or defraud creditors. The facts which Mr. Hinahara learned through the Hale Kuai transaction made him more suspicious of Kimura generally by May 2008, but those suspicions had nothing to do with whether Kimura was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder,

---

[48] Dkt. 144 at 39-41, 46.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 15 of 72

delay, or defraud creditors.

32.    A reasonable person in the Hinaharas' position would have become highly suspicious of Kimura and MFC in the course of the Bradbury/Flood transaction.

a.    Before the loan closed in June 2007, Mr. Hinahara knew that the total loan amount was larger than Kimura had represented and that the Hinaharas were not going to get a mortgage on the Bradbury/Flood property as Kimura had promised.  Mr. Hinahara chose to proceed with the transaction anyway, based on his trust in and the track record of Kimura and MFC. A reasonable person in the Hinaharas' shoes may or may not have made the same decision. The reasonable person might have had questions about Kimura's candor (*i.e.*, why Kimura did not tell Mr. Hinahara that the deal had changed). The reasonable person would have considered this information along with all of the other (mostly favorable) information then available, and would not have suspected that Kimura or MFC was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder, delay, or defraud creditors.

b.    Kimura and MFC promised the Hinaharas that MFC would repay the Hinaharas when Mr. Bradbury and Ms. Flood repaid MFC. MFC broke this promise. When Mr. Hinahara asked Kimura about the status of the Bradbury payoff, Kimura lied. Mr. Hinahara knew that Kimura had lied when he discovered, in January or February 2009, that MFC had released its mortgage on the Bradbury/Flood property. When Mr. Hinahara demanded an explanation, Kimura told an obvious lie, claiming that he thought the Hinaharas would rather receive continued interest

16

payments rather than a return of their principal.[49] A reasonable person in the Hinaharas' position would have wondered why MFC had kept the Bradbury/Flood payoff, rather than repay the Hinaharas. The hypothetical reasonable person would have strongly suspected that MFC kept the money because it needed the cash for other purposes; in other words, that MFC did not have enough money to pay its debts and therefore was insolvent.

33. A reasonable person in the Hinaharas' position who conducted a diligent investigation at any time prior to the cease and desist order in October 2009 would not have learned that MFC or Kimura was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder, delay, or defraud creditors. Kimura must have been an expert liar. He was able to convince many investors to provide millions of dollars to him and MFC. He managed to keep a Ponzi scheme alive for about twenty years. This is an exceptional feat. (Because the debts of a Ponzi scheme increase exponentially, the promoter of the scheme must raise new investments at an exponentially increasing rate. This usually becomes impossible after a few years at most.) He was able to deceive banks to make loans to MFC and him and to fool the Commissioner of Financial Institutions for decades. Kimura almost certainly would have been able to fool a reasonable person in the Hinaharas' position who conducted a diligent investigation of MFC's affairs.

34. Kimura's accounting firm compiled MFC's annual financial statements. The financial statements were false in that they did not reflect MFC's liability to the

---

[49] Dkt. 147 at 65-66.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 17 of 72

Hinaharas and others on nearly all of the "Notes Payable."[50]

35.    A reasonable person in the Hinaharas' position, who had a rudimentary ability to read financial statements, reviewed MFC's financial statements, and knew that MFC owed that person a substantial amount of money, would have seen that MFC's financial statements did not reflect MFC's liability to that person. The reasonable person therefore would have known that the financial statements were materially false. This "cooking of the books" would have made the reasonable person suspect that MFC was insolvent and was engaging in fraudulent conduct.

36.    The Hinaharas never reviewed any of MFC's financial statements and therefore had no actual knowledge that they were false.[51]

37.    For the reasons explained below, the Hinaharas did not have a legal right to require MFC to produce its financial statements. The Hinaharas could have demanded that MFC produce financial statements before the Hinaharas made deposits with MFC. But a reasonable person in the Hinaharas' position, who reasonably believes he is making a deposit with the equivalent of a bank,[52] would probably not ask to see the "bank's" financial statements.

38.    Even if the Hinaharas had made the request, it is virtually certain that Kimura would have lied successfully. He would have concocted a false story or a phony set of financial statements that would have allayed the Hinaharas' concerns. After all, Kimura was able to produce false financial statements for MFC that kept

---

[50] Ex. 53-66.

[51] Dkt. 148 at 76.

[52] Dkt. 148 at 29.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 18 of 72

banks and the Commissioner of Financial Institutions in the dark for many years.

## VII. Transfers to the Hinaharas and Prejudgment Interest

39. Trial Exhibit 2 accurately states the amount, date, and transferee of each transfer MFC made to the Hinaharas.

40. MFC made transfers to the Hinaharas in the total amount of $988,879.75. Thus, the Hinaharas received $52,729.75 more than their total deposits with MFC. All of the transfers they received during and after January 2009, and part of the transfer they received in December 2008, represent the Hinaharas' illusory "profits" on their deposit.

41. The transfers made during and after February 2009, when Mr. Hinahara learned that Kimura had lied to him about the Bradbury/Flood payoff, amount to $42,275,53.

42. Prejudgment interest at ten percent per annum from the date of each transfer to March 10, 2014 (the commencement of the trial) totals $1,030,469.38. Interest, at ten percent per annum on the total amount of the transfers, continues to accrue at $270.93 per day from and after March 10, 2014.[53]

43. Prejudgment interest at ten percent per annum from the date of each transfer made during and after January 2009 to March 10, 2014 (the commencement of the trial) totals $24,394.66. Interest, at ten percent per annum on the total amount of those transfers, continues to accrue at $13.99 per day from and after March 10, 2014.

---

[53] Ex. 2.

19

## PROPOSED CONCLUSIONS OF LAW

### I.  Jurisdiction and Venue

1.  The bankruptcy court and district court have subject matter jurisdiction over this adversary proceeding. Venue is proper in this district. The bankruptcy court lacks constitutional authority to enter a final judgment[54] but has the power to issue proposed findings of fact and conclusions of law and a recommended judgment for de novo review by the district court.[55]

### II.  The Legal Standard

2.  A bankruptcy trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . ."[56] This allows trustees to assert avoidance claims under state law that an actual creditor could assert.[57]

3.  Hawaii has enacted the Uniform Fraudulent Transfers Act, which provides that a creditor (and therefore the trustee) can avoid a transfer by a debtor "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."[58]

4.  A plea agreement, in which the defendant admits that he operated a

---

[54] *Exec. Benefits Ins. Agency, Inc. v. Arkinson (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 562-63 (9th Cir. 2012).

[55] *Executive Benefits Ins. Agency v. Arkinson*, 134 S. Ct. 2165, 2174-75 (2014).

[56] 11 U.S.C. § 544(b)(1) (2012).

[57] *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and Tech. Group, Inc.)*, 916 F.2d 528, 534-35 (9th Cir. 1990); 5 Collier on Bankruptcy, ¶ 544.06[2] (16th ed. 2014).

[58] Haw. Rev. Stat. § 651C-4(a)(1) (2014).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 20 of 72

Ponzi scheme, conclusively establishes that the defendant made transfers with the intent to hinder, delay, or defraud creditors.[59]

5.      A transfer to a person "who took in good faith and for a reasonably equivalent value" is not avoidable. This is an affirmative defense; the transferee bears the burden of establishing both of these elements.[60]

6.      The combined effect of these rules is that a person who invests in a Ponzi scheme, and who receives transfers from the scheme in good faith, is liable for any "profits" the investor made (*i.e.*, the amount of the transfers received minus the investor's total investment). If the investor did not receive the transfers in good faith, the investor is liable for all of the transfers received, even those that represent the return of the investor's original investment.[61]

## III.    The Standard of Proof

7.      The trustee argues that the Hinaharas must prove the elements of their affirmative defense by clear and convincing evidence. The Hinaharas argue that the preponderance of the evidence standard applies. I agree with the Hinaharas.

        a.      The trustee has not cited, and I have not found, any case holding that a heightened standard of proof applies to the affirmative defense of good faith and value under Hawaii law or the Uniform Fraudulent Transfers Act.

        b.      Hawaii courts require a higher standard of proof for fraud claims

---

[59] *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008).

[60] Haw. Rev.Stat. § 651C-8(a); *Hayes,* 916 F.2d at 535.

[61] *Donell v. Kowell*, 533 F.3d 762, 774-75 (9th Cir. 2008).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 21 of 72

because a finding of fraud can affect a defendant's reputation.[62] To the extent that this consideration has any bearing on the affirmative defense of good faith and value, it suggests that a person accused of receiving a fraudulent transfer should face a *lower* standard of proof than the person making the accusation.

      c.    The trustee argues that the clear and convincing standard applies to the "value" prong of the Hinaharas' affirmative defense. He contends that, in order to establish that the Hinaharas gave "value" in return for the transfers, the Hinaharas must prove that they are "tort creditors with a fraud claim for restitution," and that fraud claims must be proven by clear and convincing evidence.[63] The trustee's reasoning is flawed.

      i.    It is correct that the "value" given by the Hinaharas in return for the transfers from MFC was satisfaction of their claim against MFC.

      ii.    It is not correct, however, that the Hinaharas' claim was a fraud claim. The Hinaharas' claim against MFC began as a contract claim: they advanced money to MFC in return for MFC's promise of repayment with interest. Because Hawaii law prohibits companies like MFC from accepting deposits,[64] the contract was at least arguably unenforceable on grounds of illegality. A person who

---

[62] *Kekona v. Abastillas*, 113 Haw. 174, 180-81 (2006).

[63] Dkt. 158 at 46 (quoting *Donell v. Kowell*, 533 F.3d 762, 774-75 (9th Cir. 2008) (trustee's emphases omitted)).

[64] Haw. Rev. Stat. § 412:9-500 (2014) ("Except as otherwise expressly authorized by this chapter or other law, a nondepository financial services loan company shall not solicit, accept, or hold deposits, investment certificates, thrift certificates, or other accounts or instruments identical or similar to a deposit account, nor shall it borrow money in the form of, or issue, promissory notes, debentures, bonds, or other obligations to the public . . . .").

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 22 of 72

can't enforce an illegal contract may nonetheless have a restitution claim, even if no fraud was involved.[65]

    iii. The trustee's argument rests on selective quotations from *Donell v. Kowell*. In that case, the SEC took enforcement action against a Ponzi scheme promoter and obtained the appointment of a receiver. The receiver then brought fraudulent transfer actions against investors who had received returns from the scheme. One of the defendant investors appealed an adverse judgment on various grounds. The Ninth Circuit explained that investors in Ponzi schemes give "value" to the extent of their original investment. At one point in the opinion, the court said that the investors were "not actually investors, but rather tort creditors with a fraud claim for restitution equal to the amount they gave."[66] More often, however, the court said that the investors have claims for "restitution"[67] or "restitution and recission [sic]."[68] Sometimes, the court simply said that the investors give value "up to the amount of the original outlay,"[69] without mentioning the legal theory on which the investors might recover their original outlay. In short, *Donell* does not support the proposition

---

  [65] Restatement (Third) of Restitution and Unjust Enrichment, § 32 TD No 3 (2004); *see Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 502-03 (2004) (quoting *Small v. Badenhop*, 67 Haw. 626, 635-36 (1985)) ("'[A] person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or [choses] in action, . . ., or in any way adds to the other's security or advantage.' . . . One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust.") (internal citations omitted); *see also Beneficial Hawaii, Inc. v. Kida*, 96 Haw. 289, 314-15 (2001) (holding that a party to an unenforceable contract may have a restitution claim in some circumstances).

  [66] *Donell*, 533 F.3d at 775.

  [67]*Id.* at 771.

  [68]*Id.* at 772.

  [69]*Id.* at 771.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 23 of 72

that only tort claims for fraud count as value. Rather, it establishes that any right of recovery can constitute "value" for fraudulent transfer purposes.

        iv.     In short, the Hinaharas need not prove fraud in order to establish their restitution claim or that they gave "value."

        d.     The trustee also argues that the Hinaharas' claims are for rescission and restitution, and that these are equitable remedies which must be supported by clear and convincing evidence.[70] I disagree.

        i.     The Hinaharas' claims are not "rescission" claims. They are not trying to "rescind" a contract; rather, they are trying to get their money back even though their contract with MFC is illegal.[71]

        ii.     The trustee cites no Hawaii case holding that restitution claims or other equitable claims generally require clear and convincing proof.[72]

8.     In any event, I believe that my proposed findings of fact are supported by clear and convincing evidence. The only real dispute about the historical facts (who did what to whom and when) has to do with the amount of the Hinaharas'

---

[70] Dkt. 158 at 38-39.

[71] "Rescission developed as an equitable remedy and has the effect of cancelling, abrogating, or disaffirming a contract . . . ." *E. Sav. Bank, FSB v. Esteban*, 129 Haw. 154, 157, 296 P.3d 1062, 1065 n.5 (2013).

[72] *Eastern Savings Bank, id.*, says nothing about the standard of proof. *Thompson v. AIG Hawaii Ins. Co.*, 111 Haw. 413, 423 (2006), is also silent on the standard of proof. It says, however, that the abuse of discretion standard applies to appellate review of equitable remedies. It would be incongruous to apply a high standard of proof (clear and convincing evidence) but a low standard of review (abuse of discretion). *Maria v. Freitas*, 73 Haw. 266 (1992), holds that the clear and convincing standard applies to constructive trust claims. But the court also addressed claims of equitable estoppel and quasi-estoppel, both of which are equitable claims, without mentioning a heightened standard of proof.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 24 of 72

deposits with MFC; the documentary record is abundantly clear that the trustee is right on that issue. The only other factual dispute has to do with the Hinaharas' good faith, which turns on the mental state of a reasonable person in the Hinaharas' position. Considering all of the relevant portions of the record, I have a firm belief and a firm conviction that my proposed findings are correct and that the existence of the facts I have found is highly probable.[73]

## IV.    The Transfers are Avoidable

9.      I have previously ruled, on the trustee's motion for partial summary judgment, that the trustee has made his case in chief under section 651C-4(a)(1). In particular, Kimura's plea agreement, in which he admitted that he operated a Ponzi scheme, conclusively establishes that he and MFC made transfers with the intent to hinder, delay, or defraud creditors.[74]

10.     MFC's transfers to the Hinaharas were an integral part of the Kimura Ponzi scheme. A Ponzi scheme can survive only as long as investors continue to infuse new money into the enterprise. In order to attract new money, the promoter must create an apparent track record of success by paying earlier investors their promised returns. As soon as the scheme fails to pay the promised returns, the scheme must die. Thus, MFC's payments of principal and interest to the Hinaharas

---

[73] *Iddings v. Mee-Lee*, 82 Haw. 1, 13 (1996) ("'[C]lear and convincing' evidence may be defined as an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases. It is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable.") (citations omitted).

[74] *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 25 of 72

and other depositors and creditors were integral to the Ponzi scheme.

## V. The Hinaharas' Affirmative Defense of Good Faith and Value

### A    *Good Faith*

#### 1.    *The Definition of "Good Faith"*

11.    "Courts have been candid in acknowledging that good faith 'is not susceptible of precise definition.'"[75] The Ninth Circuit has mentioned three slightly different definitions of the phrase, without exclusively adopting any of them.

> One court has remarked that a lack of good faith is demonstrated by a transferee who knows that a debtor is operating a Ponzi scheme. . . .

> An early case cited by the trustee in this case held that a transferee's

>> knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors . . . should be deemed to have notice . . . as would invalidate the sale as to him.

> These pronouncements indicate that courts look to what the transferee objectively "knew or should have known" in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint. . . . [S]ubjective assertions of good faith . . . are of no moment.

> At least one court has held that if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent.[76]

#### 2.    *Actual Knowledge*

12.    Neither of the Hinaharas had actual knowledge, until sometime after

---

[75] *Hayes*, 916 F.2d at 536 (citations omitted).

[76] *Id.* at 535-36.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 26 of 72

MFC filed its bankruptcy petition in 2010, that Kimura or MFC was insolvent, operating a Ponzi scheme, or making transfers with the intent to hinder, delay, or defraud creditors.

### 3. *Imputed Knowledge via Partnerships*

13.     The trustee argues that the Hinaharas and Kimura were partners in various business ventures and that therefore Kimura's knowledge of his Ponzi scheme is imputed to the Hinaharas as a matter of law.

14.     The trustee's premise is correct: the Hinaharas and Kimura owned various properties as partners. A partnership is the association of two or more persons to carry on as co-owners a business for profit.[77]  Profit sharing is prima facie evidence of a partnership.[78] The joint real estate investment ventures involving the Hinaharas and Kimura (including those that also involved Mrs. Kimura and third parties) were partnerships. (The coordinated loans made by the Hinaharas and MFC, however,  were not partnerships.)

15.     The question of whether Kimura's knowledge is imputed to the Hinaharas by virtue of their partnerships requires further discussion.

16.     Two different partnership statutes apply.

        a.      Hawaii adopted the Revised Uniform Parnership Act ("RUPA") on July 1, 2000.[79] All of the Kimura/Hinahara partnerships formed on or after that

---

[77] Haw. Rev. Stat. §§ 425-109(a), -106(1) (West 1995); Uniform Partnership Act § 6(1) (1914).

[78] Haw. Rev. Stat. §§ 425-109(a), -109(c)(3), -107(4) (West 1995).

[79] 1999 Haw. Sess. Laws 886.

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed 07/11/14  Page 27 of 72

date are governed by RUPA.

b. Before RUPA, the Uniform Partnership Act ("UPA") was in force.[80] The earlier Kimura/Hinahara partnerships are arguably controlled by UPA.[81]

17. Both RUPA and UPA provide that notice to or knowledge of a partner is imputed to the partnership. Neither statute says that such notice or knowledge is also imputed to the other partners.

a. Under RUPA, "[a] partner's knowledge, notice, or receipt of a notification of a fact relating to the partnership is effective immediately as knowledge by, notice to, or receipt of a notification *by the partnership*, except in the case of a fraud on the partnership committed by or with the consent of that partner."[82] Under the plain language of RUPA, one partner's knowledge "of a fact relating to the partnership" is imputed to the partnership, but not to the other partners.[83]

b. Under UPA:

> Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, *operate as notice to or knowledge of the partnership*, except

---

[80] 1972 Haw. Sess. Laws 174.

[81] It is not clear whether UPA still governs partnerships formed pre-RUPA. Section 1206 of RUPA is a transition provision. One of its subsections sets a date upon which RUPA would become the governing law for all extant partnerships. Hawaii's legislature, however, did not enact section 1206. Instead, it simply repealed UPA. As a result, it is not clear whether the legislature intended that RUPA would apply to pre-RUPA partnerships. But it does not matter for purposes of this case, because RUPA and UPA's rules about imputation of notice are identical in substance.

[82] Haw. Rev. Stat. § 425-102(f) (emphasis added).

[83] The Hinaharas offered no evidence that Kimura perpetrated or consented to a fraud on any of their partnerships.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 28 of 72

in the case of a fraud on the partnership committed by or with the consent of that partner.[84]

      c.    The text of the governing statutes says that knowledge is imputed to the partnership but does not say that one partner's knowledge is imputed to all other partners. The plain language of the statutes should be the end of the matter.

      d.    The official comment to section 12 of the UPA does not change this result. The trustee relies on the statement that, "[a]t present, there is no confusion in the law when the 'notice' is given to the partner while he is a partner. In such cases *the effect is the same as if* notice was had by all the partners."[85] The "effect" to which the comment refers is notice to the *partnership*, as UPA provides.

18.    In the absence of Hawaii case law directly on point, federal courts must "'predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'"[86] Hawaii's Supreme Court construes a statute by beginning with the plain language of the statute.[87] I predict that Hawaii's state courts would follow the plain language of RUPA and UPA and hold that notice to a partner is imputed to the partnership but not to the other partners.

19.    The trustee argues that "'[w]ell established concepts of partnership

---

[84] Haw. Rev. Stat. § 425-112 (West 1995) (emphasis added).

[85] Uniform Partnership Act § 12 cmt. (1914) (emphasis added).

[86] *Spear v. Wells Fargo Bank, N.A. (In re Bartoni-Corsi Produce, Inc.)*, 130 F.3d 857, 861 (9th Cir. 1997) (quoting *Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996)).

[87] *Keliipuleole v. Wilson*, 85 Haw. 217, 221 (1997).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 29 of 72

doctrine impute the knowledge and actions of one partner to all others.'"[88] The concept of imputation of notice among partners is an anachronism.

a.     At common law, a partnership was regarded as an aggregate of the partners. The partnership was not regarded as a separate entity.[89] Under this view, it was nonsense to speak of notice to a partnership, because the partnership had no separate existence.

b.     When the Commissioners on Uniform State Laws decided to draft a uniform partnership law in 1905, the entity theory of partnerships–the notion that a partnership was an entity separate from its partners–was beginning to gain currency, but was not universally accepted. Partly because of the disagreement between supporters of the entity theory and the aggregate theory, UPA has some provisions that are consistent with the entity theory and others which rest upon the aggregate theory of partnerships.[90] As far as notice is concerned, however, there was no ambiguity. The plain language of UPA provides that notice to a partner is imputed to the partnership. UPA does not provide for the imputation of notice to other partners.

c.     RUPA, promulgated in 1997 and enacted in Hawaii in 2000, finally and firmly adopted the entity theory. Under RUPA, a partnership is an entity

---

[88] Dkt. 158 at 18 (quoting *Friend v. H. A. Friend & Co.*, 416 F.2d 526, 553 (9th Cir. 1969)).

[89] At common law, and under the "aggregate theory," partners were considered co-principals in a mutual agency relationship. Gary S. Rosin, *The Entity-Aggregate Dispute: Conceptualism and Functionalism in Partnership Law*, 42 Ark. L. Rev. 395, 430-31 (1989).

[90] A. Ladru Jensen, *Is a Partnership Under the Uniform Partnership Act an Aggregate or an Entity?*, 16 Vand. L. Rev. 377, 378-79 (1962-63).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 30 of 72

distinct from the partners.[91] Both the letter of RUPA and the entity theory which it adopts provide that notice to partners is notice to the partnership, but not to the other partners.

        d.     In short, the doctrine that notice to one partner is imputed to all other partners was correct at common law, but is no longer correct under UPA and RUPA.

     20.     Hawaii case law does not overrule the plain language of RUPA and UPA.

        a.     In *Winkelbach*,[92] the Hawaii Supreme Court held that a particular agreement did not create a partnership. The comment about imputation of knowledge among partners is dicta.[93] Further, the court decided the case long before Hawaii adopted UPA and RUPA. The court's words cannot change the meaning of

---

[91] Haw. Rev. Stat. § 425-108 (2014); Uniform Partnership Act § 201(a) (1997); J. William Callison & Maureen A. Sullivan, Partnership Law and Practice: General and Limited Partnerships, § 3:1 (2013); *see* the Official Comments to the Revised Uniform Partnership Act § 201 (2013-14) ("RUPA embraces the entity theory of the partnership. In light of the UPA's ambivalence on the nature of partnerships, the explicit statement provided by subsection (a) is deemed appropriate as an expression of the increased emphasis on the entity theory as the dominant model.").

[92] *Winkelbach v. Honolulu Amusement Co.*, 20 Haw. 498, 502 (1911).

[93] Even the dicta does not fully support the trustee's argument.

    [T]he contract of partnership is something more than an ordinary contract. It creates, in addition to the contractual relation, a status. It brings into existence, *in a limited degree*, a legal entity, the members of which are co-principals and who are, in contemplation of law, clothed with the power of mutual agency, whereby, *within well defined limits*, each member may act for all and in the name of the legal entity-the partnership."

*Id.* at 502 (emphasis added). Thus, even before UPA, Hawaii law was beginning to treat a partnership as a separate entity and to limit the partners' authority to bind each other and the partnership.

31

statutes enacted in Hawaii decades later.

b.     In *Eastern Iron*,[94] a corporation agreed to sell certain scrap iron.
The corporation had previously contributed the scrap iron to a joint venture of which
the corporation was a member. The corporation took the buyer's down payment but
never delivered the scrap iron. The court held that the buyer was entitled to enforce
the contract against the joint venture because the corporation had power to bind the
joint venture of which it was a member and that both joint venturers were liable for
the buyer's damages. *Eastern Iron*, like *Winkelbach*, was decided before RUPA and
UPA became the law of Hawaii. Further, the case was really about the power of one
joint venturer to bind the other joint venturers to a contract. The other joint venturer
would have been liable to the buyer even if notice of the contract were not imputed
to that venturer.

c.     In *Fujimoto v. Au*,[95] two limited partnerships, with different
individuals as their general partners, formed a joint venture to develop real estate. A
group of limited partners sued the general partners of both limited partnerships for
(among other things) diverting the money invested by the limited partners. The
general partners argued that, even if they were liable to the limited partners of the
limited partnership of which they were general partners, they were not liable to the
limited partners of the other partnership.  The Supreme Court held that the general
partners were liable to all of the limited partners, because the two partnerships had

---

[94] *E. Iron & Metal Co. v. Patterson*, 39 Haw. 346 (1952).

[95] *Fujimoto v. Au,* 95 Haw. 116 (2001).

32

entered into a joint venture. The court said that there were unanswered questions about the extent of some of the general partners' participation in the fraud, "[b]ut, in any event, lack of actual knowledge of wrongdoing and innocence of fraud, in themselves, do not absolve one joint venturer of liability for the fraud of another joint venturer acting within the scope and authority of the joint venture."[96] The language about imputation of notice which the trustee quotes has nothing to do with the holding of the case.

      d.    The trustee cites *Hayes v. Silver Queen Project I*,[97] in violation of a Ninth Circuit rule prohibiting the citation of unpublished decisions to the courts of the Ninth Circuit.[98] A company that operated a Ponzi scheme was the general partner of certain limited partnerships. The partnerships received transfers from the Ponzi scheme which the company's bankruptcy trustee sought to recover. The court said that, because the perpetrator of the Ponzi scheme was a general partner in the transferee partnerships, "there is no question that the limited partnerships knew the transfers were fraudulent. . . ." *Silver Queen* says that the *partnership* knows what the general partner knows, but it says nothing about the imputation of knowledge to other partners. (Further, in this case the trustee is not attempting to recover transfers to the Kimura/Hinahara partnerships; instead, he is attempting to recover other

---

    [96] *Fujimoto*, 95 Haw. at 160. *See also id*. at 161 ("Au and Hewitt are liable for any tortious wrongdoing of their copartners, acting in the course of the business of the joint venture, committed against third persons regardless of their (i.e., Au's and Hewitt's) degree of involvement in the management of the enterprise. They are liable jointly and severally with other partners for any losses incurred by third persons resulting from such tortious acts.").

    [97] *Hayes v. SilverQueen Project I*, Nos. 89-16217, 89-16433, 1991 WL 1669 (9th Cir. 1991).

    [98] Fed. R. App. P., Ninth Circuit Rules, 36-3(c).

33

transfers directly to the Hinaharas.)

21.     None of the other cases quoted by the trustee are binding. Additionally, in almost all of those cases, the quoted language is pure dicta, or supports an alternative rationale for a decision independently supported by other reasons, or is otherwise unnecessary to the court's decision, or is incorrect and unpersuasive.[99]

22.     In short, modern partnership law and the plain language of UPA belie the trustee's imputation argument.[100]

23.     Further, the trustee's imputation argument leads to an unjust result. If the trustee is right, the Hinaharas are stuck with Kimura's knowledge of his own wrongdoing precisely because the Hinaharas trusted Kimura enough to become his partners. In other words, according to the trustee, the Hinaharas are worse off because Kimura conned them more thoroughly than others. Neither law nor justice supports this result.

24.     Assuming that knowledge is imputed from one partner to other partners (as opposed to the partnership), the imputation rule applies only to a "fact relating to the partnership" (under RUPA) or "any matter relating to partnership affairs" (under UPA).[101] The Hinaharas argue that imputation does not apply because Kimura's Ponzi scheme had nothing to do with the Kimura/Hinahara partnerships. I disagree.

---

[99] The trustee quoted so many cases that he decided to do so in an appendix. I will return the favor. *See* Appendix I. Unfortunately, my appendix is longer than the trustee's because mine analyzes the cases to see whether the trustee's quotes have any precedential effect.

[100] In support of his motion for summary judgment, the trustee argued that Kimura's knowledge is imputed to the Hinaharas by virtue of their common interests in certain corporations and LLCs. I rejected that argument and the trustee has not raised it again.

[101] Haw. Rev. Stat. §§ 425-102(f), -112 (West 1995).

34

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 34 of 72

Every transfer that Kimura made while he was operating the Ponzi scheme was made with fraudulent intent. (This is so because everything a Ponzi scheme does is fraudulent. Every Ponzi scheme is mathematically doomed to failure and insolvency; its liabilities increase at an exponential rate, so eventually the assets must become insufficient to pay those liabilities. An enterprise that has absolutely no hope of survival is a fraud from beginning to end.) Therefore, every contribution that Kimura made to the partnerships was potentially recoverable as a fraudulent transfer. The fact that Kimura was exposing the partnerships to enormous risk is a "fact relating to the partnerships" and a "matter relating to partnership affairs." (But this does not matter because, for the reasons given above, Kimura's knowledge of his Ponzi scheme was not imputed to the Hinaharas, his fellow partners.)

### 4. Imputed Knowledge via Agency

25. The trustee argues that Kimura's knowledge is imputed to the Hinaharas because they authorized him to act as their agent "with regard to certain money."[102]

26. An agency relationship exists if one person (the principal) consents to another person (the agent) acting on his behalf and the other person consents to be controlled by the first.[103]

27. Information gained in the scope of an agency is generally imputed the

---

[102] The trustee made this argument in his trial brief, dkt. 90 at 7, but not in his closing argument. The trustee may have abandoned this argument, but I will address it anyway.

[103] Restatement (Second) of Agency § 1 (1958); *see State v. Hoshijo ex rel. White*, 102 Haw. 307, 318-21 (2003) (citing the Restatement (Second) of Agency).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 35 of 72

principal.[104]

28.     The Hinaharas allowed Kimura to deliver checks payable to the Hinaharas to their bank for deposit in their account, and they gave him blank deposit slips to make this process easier. This is more like a messenger service than an agency, but to the extent it created an agency at all, its scope was very narrow. Kimura's operation of a Ponzi scheme is not within the scope of the "agency" under which he physically carried the Hinaharas' checks to their bank for deposit in their account.[105]

29.     Kimura handled the funds of the joint investments and sometimes invested these funds by depositing them with MFC. There was no separate agency apart from the partnership relation and no separate basis for the imputation of knowledge.

>     5.     "Red Flags"

30.     The trustee argues that there were many "red flags" which should have alerted the Hinaharas to Kimura's and MFC's fraudulent intent.

31.     Prior to January 2009, a reasonable person in the Hinaharas' position would not have suspected that Kimura or MFC was insolvent, operating a Ponzi scheme, or making fraudulent transfers.

___

[104] *Imperial Finance Corp. v. Finance Factors, Ltd.*, 53 Haw. 203, 206 (1971) (citing the Restatement (First) of Agency § 275 (1933)); Restatement (Second) of Agency § 9 (1958).

[105] This case is radically different from *Field v. DeCoite*, 2013 WL 2897792 (D. Haw. 2013). Because Mr. DeCoite gave Kimura unfettered power to handle Mr. DeCoite's personal finances, I held that Mr. DeCoite, as principal, was charged with Kimura's knowledge of the Ponzi scheme when Kimura deposited DeCoite's money with MFC. The messenger services that the Hinaharas let Kimura provide for him are much narrower that the carte blanche that Mr. DeCoite gave Kimura.

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 36 of 72

32.     Even if the hypothetical reasonable person had become suspicious prior to January 2009 and conducted a diligent investigation, the reasonable person would have learned nothing. Kimura, an accomplished liar, would have fooled the reasonable person, just as he fooled MFC's regulator, banks, and many actual persons.

33.     As is noted above, a reasonable person in the Hinaharas' position who reviewed MFC's financial statements would have discovered MFC's fraud. The trustee argues that the Hinaharas were partners with MFC (in making the coordinated loans) and that therefore the Hinaharas had the right to review MFC's books. I disagree.

a.     The Trustee's premise is that the loans created partnerships. I have found that this premise is incorrect.

b.     From this faulty premise, the trustee draws the conclusion that the Hinaharas had a right to inspect MFC's books. This is incorrect. A partner has the right to review the books of the partnership,[106] but not the books of its fellow partners. Even if MFC and the Hinaharas were partners, MFC was not the partnership, and the Hinaharas had no right to review its books.

34.     The trustee also correctly points out that the Hinaharas never reviewed the books of any of the partnerships, corporations, or limited liability companies in which they invested with Kimura. But the records of those entities would not have revealed the Kimura Ponzi scheme.

---

[106] Haw. Rev. Stat. § 425-122(c) (2014) ("Each partner and the partnership shall furnish to a partner . . . information concerning *the partnership's* business and affairs . . . .").

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 37 of 72

35.     The situation changed in January or February 2009, when Mr. Hinahara learned that MFC had kept the proceeds of the Bradbury loan repayment and that Kimura had lied to Mr. Hinahara about it. At that point, a reasonable person would have been convinced, without the need for further investigation, that MFC and Kimura were robbing Peter (the Hinaharas) to pay Paul (other creditors) because MFC was insolvent.

36.     Therefore, the Hinaharas did not receive the transfers during and after February 2009[107] in good faith.

## C.     Reasonably Equivalent Value

37.     "Value" is property or satisfaction of an antecedent debt.[108] Whether the defendant gave value must be viewed from the perspective of the transferor's creditors.[109]

38.     "The primary focus of the reasonable value inquiry must be on whether the transferor . . . received reasonably equivalent value, not on whether the defendants gave reasonably equivalent value to someone else."[110] Therefore, any payments that the Hinaharas made to Kimura do not constitute "value" given to

---

[107] The evidence shows that Mr. Hinahara learned of Kimura's lies in January or February 2009. I conclude that the transfers in January 2009 are recoverable, regardless of the Hinaharas' good faith, because they represent illusory "profits" on the Hinaharas' investment. *See* section VI below. Therefore, I need not resolve the question of when exactly the Hinaharas knew or should have known of MFC's insolvency and fraudulent intent.

[108] *Hayes*, 916 F.2d at 540; Haw. Rev. Stat. § 651C-3(a) (2014).

[109] *Hayes*, 916 F.2d at 540.

[110] *Field v. Marumoto (In re Maui Indus. Loan & Finance Co.)*, No. 12-90015, 2013 WL 1909536, at *2 (Bankr. D. Haw. May 8, 2013) (citing *Hayes*, 916 F.2d at 540).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 38 of 72

MFC in exchange for MFC's transfers to the Hinaharas.

39.     The Hinaharas' deposits with MFC were "deposits" under Hawaii law.[111] MFC was a nondepository financial services loan company that lacked authority to accept deposits.[112] The Hawaii statute does not describe the rights of a person who makes a deposit with a nondepository financial services loan company. But the depositor's contract with the nondepository financial services loan company is probably unenforceable as illegal.[113]

40.     Even if the contract is unenforceable, the depositor has claims for restitution to the extent of the principal amount of the deposits (but not any promised return on the deposits).[114] Restitution is commonly employed to deal with the fallout from an illegal contract.[115]

41.     The trustee argues that the Hinaharas' restitution claims are entirely barred if the court finds that the Hinaharas ever failed to act in good faith. I disagree. The restitution claimant's good faith should be assessed as of the time of the transaction giving rise to the claims (*i.e.*, when the Hinaharas made their deposits).[116]

---

[111] Haw. Rev. Stat. § 412:1-109 (2014).

[112] Haw. Rev. Stat. § 412:9-500 (2014).

[113] Haw. Rev. Stat. § 1-6 ("Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed.").

[114] *Donell v. Kowell*, 533 F.3d 762, 776 (9th Cir. 2008) ("[T]he Receiver is only entitled to recovery of the amounts above Kowell's initial investment transferred within the limitations period.").

[115] *See, e.g., Kida*, 96 Haw. at 314-15.

[116] *Helms v. Roti (In re Roti)*, 27 B.R. 281, 298-99 (Bankr. N.D. Ill. 2002).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 39 of 72

42.     The Hinaharas acted in good faith when they made their deposits with MFC. They have valid restitution claims against MFC for the amount of their deposits (but not the interest that MFC promised to pay). The partial satisfaction of those restitution claims is "value" given in return for MFC's transfers to the Hinaharas.

## VI.     Amount of Trustee's Recovery

43.     All of the transfers which the Hinaharas received prior to December 2008, and a portion of the transfer they received during that month, represent a return of the Hinaharas' original investment. A portion of the transfer they received in December 2008, and all of the transfers they received thereafter, represent illusory "profits" on their investment. The Hinaharas are liable for those profits regardless of whether they received them in good faith.

44.     The Hinaharas did not receive the transfers during and after February 2009 in good faith. Those transfers are also included in the "profits" which the trustee is entitled to recover regardless of the Hinaharas' good faith.

45.     Allowing the trustee to recover the "profits" plus the "bad faith" transfers would give the estate an improper double recovery.

46.     Therefore, the trustee is entitled to recover the total amount of the transfers to the Hinaharas minus their total deposits.

## VII.     Prejudgment Interest

47.     The court has discretion to grant prejudgment interest under state law

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 40 of 72

on the fraudulent transfers from the date each transfer was made.[117] "[P]rejudgment interest should not be thought of as a windfall in any event; it is simply an ingredient of full compensation that corrects judgments for the time value of money."[118]

48.     The trustee should recover pre-judgment interest at the Hawaii rate of 10 percent per annum from the date on which the transfers were made.[119] The ten percent rate is very high under current economic conditions, but the establishment of the legal rate of interest is a legislative judgment which the court should not override.

## VIII.  Conclusion

I recommend that the district court enter judgment in favor of the trustee and against the Hinahara in the amount of $52,729.75 plus prejudgment interest through March 10, 2014 of $24,394.66 and additional prejudgment interest at $13.99 per day from March 10, 2014 until the entry of judgment.

<b>END OF RECOMMENDATION</b>

---

[117]*In re Slatkin*, 525 F.3d at 820; *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 541-42 (9th Cir. 1990).

[118]*Donell*, 533 F.3d at 772 (*quoting In re P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998)).

[119]Haw. Rev. Stat. § 636-16; *Donell*, 533 F.3d at 772; *Eastman v. McGowan*, 86 Haw. 21, 28, 946 P.2d 1317, 1324 (1997).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 41 of 72

# APPENDIX I

## Analysis of Cases Quoted by Trustee on
## Imputation of Knowledge Among Partners

The cases that the trustee quotes can be loosely divided into five categories. (As the following discussion will show, some fall in more than one of the categories.)

Importantly, none of the opinions explain why the court used language that deviates from the plain language of UPA and RUPA.

## I.      Dicta

In most of the quoted cases, the courts' comments about the imputation of knowledge among partners was not necessary to the courts' decision and are therefore dicta.

*N.L.R.B. v. Broad St. Hosp. & Med. Ctr.*, 452 F.2d 302 (3d Cir. 1971). Weissman, the administrator of a hospital and a partner in a partnership that owned the hospital, orally recognized a union as a bargaining unit. After Weissman died, the hospital refused to recognize the union. The court held that Weissman's recognition was binding on the partnership. The court quoted a statement in a footnote that notice to one partner is notice to all partners, but all that was necessary to decide the case was to hold that a partner's acts on behalf of the partnership bind the partnership. The liability of other partners was not in issue.

-42-

*FDIC v. Jeff Miller Stables*, 573 F.3d 289 (6th Cir. 2009). Steve embezzled over $2 million from a bank of which he was CEO and used the money to benefit a horse racing operation of which he and his brother and sister-in-law, Jeff and Lori, were general partners. The FDIC seized the bank and sought to recover the money from the partnership. The district court held that Steve's knowledge of the fraud was imputed to Jeff. On appeal, Jeff argued that Steve's knowledge was not imputed to him because Steve was perpetrating a fraud on the partnership, and that the district court erred in putting on him the burden of proving Steve's fraud. Jeff said that the court should have required the FDIC to prove that there was fraud. The court of appeals found no error. Because Jeff implicitly conceded that knowledge of one partner is attributed to the others, the court's statements about the general rule of imputation are dicta.

*Friend v. H.A. Friend & Co.*, 416 F.2d 526 (9th Cir. 1969). Harvey Friend and his four sons were partners in a retail paper business based in Illinois. In 1948, the oldest son, Wilber, had a falling out with the family. He said he was leaving Illinois for Pasadena to engage in the wholesale paper business under the name of Friend Paper Co. Harvey bought Wilber out of the partnership and he and the other sons formed a new partnership to carry on the retail business. Instead of doing a wholesale paper business, Wilber started a retail business and used the partnership's trademarks. The partnership got a judgment against Wilber for unfair competition, trademark infringement, etc. On appeal, Wilber argued that the partnership's claims were barred

-43-

by laches. The trial court had found that, in 1957, Harvey received a letter "which informed him of [Wilber's] duplicity," but decided that "this did not put appellee [the partnership] on notice." *Id.* at 532-33. The trial court found that the first notice to the partnership came in 1962 and that the partnership had made its demand soon enough after that to avoid laches. The court of appeals agreed with the result, but not the reason.

> We must initially determine whether 1957 or 1963 [sic?] is the significant date. In our judgment, the district court erred in focusing on the 1962 confrontation. Well established concepts of partnership doctrine impute the knowledge and actions of one partner to all others. . . . Appellee points to Harvey Friend's age and ill health as reasons explaining why his partners were not informed and argue this as a reason for postponing the measuring date for laches purposes. This is unpersuasive since appellees, by remaining in partnership with Harvey Friend and permitting him to act for the partnership-as he did here-are foreclosed from now disclaiming his actions.

*Id.* at 533. The court went on to hold that laches did not apply because Wilber was not prejudiced by the delay. The statements about notice to the other partners are dicta because laches would not have applied (due to the lack of prejudice) regardless of who had notice. The statements are also unnecessary. The partnership was the plaintiff. Its conduct determined whether laches applied. The partnership was on notice because Harvey was on notice, and laches could have barred the claims regardless of notice to the other partners.

*Stork Rest., Inc. v. Sahati*, 166 F.2d 348 (9th Cir. 1948). In an action to enjoin trademark infringement, the defendant partnership claimed that the plaintiff had not made an adequate demand because only one of the partners received the notice. The court said

-44-

that "[n]otice to one partner is notice to all," *id.* at 362, but went on to say that a formal demand was not even necessary. So the comments about imputation are dicta.

*Camacho v. U.S.*, 195 B.R. 114 (D. Alaska 1996). Indirect partners of pass-through partnerships challenged taxes assessed to them as a result of audits of a top-tier partnership. They argued that IRS did not give them notice. The court held that, under federal tax law, notice to the indirect partners was not required. The court also addressed their arguments under general partnership law, but the comments about imputation are dicta.

*Prisco v. Westgate Entm't, Inc.*, 799 F. Supp. 266 (D. Conn. 1992). A law firm represented a limited partnership and one of its limited partners. While the law firm represented the partnership, the limited partners voted to remove and replace the two general partners. The limited partners sued one of the general partners. The law firm represented the limited partners in the suit. The former general partner moved to disqualify the law firm, claiming that the firm had also provided legal services to the general partner. The court said that "it is basic partnership law that every partner is an agent of the partnership and that the knowledge of a partner regarding partnership affairs is imputed to all other partners," and noted evidence that the law firm had provided legal services to the general partner. The court held that the law firm had an attorney-client relationship with the general partner ("the court fails to see how the duty of loyalty would allow a general counsel for a partnership to represent one

-45-

partner against another partner in a suit arising out of partnership business," *id.* at 270) and disqualified the firm. The comment about imputation of knowledge was unnecessary to the court's decision.

*Hartford Acc. & Indem. Co. v. Hartley*, 275 F. Supp. 610 (M.D. Ga. 1967), *affirmed per curiam*, 389 F.2d 91 (5th Cir. 1968). A partnership operated a bank. The partner in charge applied for a surety bond but did not disclose that he was misappropriating the bank's money. A receiver for the bank filed a claim against the surety, which responded that the bond was void because of false statements in the application. The court held that the fraud invalidated the bond *ab initio* because the partnership is charged with a partner's fraudulent acts in the course of partnership business. "[T]here is no doubt that there was fraud in the application and that the bond was void ab initio unless the knowledge of the true facts is not *imputable to the firm* . . . . [H]ere it is an undisputed fact that Mr. Thompson had sole and complete control of the operations of the bank and that he also had full knowledge of all of the misappropriations of the funds of the bank, being himself the perpetrator thereof. Therefore, it must be held that his knowledge was *the firm's knowledge* . . . ." *Id.* at 617-18 (citations omitted, emphasis added). The case had nothing to do with imputation to the other partners.

*Grassmueck v. American Shorthorn Ass'n*, 365 F. Supp. 2d 1042 (D. Neb. 2005). The Hoyts induced people to invest in partnerships and other entities that supposedly

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed  07/11/14  Page 46 of 72

owned valuable cattle. A bankruptcy trustee representing over 300 partnerships and other entities sued two defendants, alleging that they had enabled the Hoyts to falsely register cattle and had thereby contributed to the fraud. The court found the trustee's claims were barred by *in pari delicto* for two reasons. First, the Hoyts' knowledge of the fraud was imputed to all of the partnerships. (The court also referred to notice to the partners, but because the trustee was bringing claims on behalf of the partnerships' estates, notice to the partners was irrelevant and the court's comments are dicta.) Second, the partnerships are liable for the wrongful acts of the Hoyts in the course of partnership business. (The knowledge of the partners is irrelevant to this rationale.)

*Engl v. Berg*, 511 F. Supp. 1146, 1154 (E.D. Pa. 1981). Investors sued a partnership and others, alleging (among other things) securities violations. The partnership argued that the complaint did not adequately plead the partnership's scienter. The complaint alleged that the partnership's general partner acted with fraudulent intent. The court held that this was sufficient. The court said that "under the law of partnerships, knowledge and actions of one partner are imputed to all others," but this was irrelevant because imputation of the partner's intent to the partnership, not the other partners, was all that was required.

*CIT Grp./Equip. Fin., Inc. v. Roberts*, 885 So. 2d 185 (Ala. Civ. App. 2003). A debtor owned trucks and trailers that were subject to secured claims. When the debtor ceased operations, the equipment was stored in a yard. The owner of the yard argued

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 47 of 72

that the secured creditor should pay a reasonable storage charge. There was no express contract, so the yardowner argued for an implied contract. The court said that could arise only if the party to be charged knowingly accepted benefits from the other, and there was no basis to say that the secured lender knowingly got the benefit of the storage. The court listed various situations in which knowledge can be imputed (including among partners), but said none of those circumstances existed in the case before it. So the statement about imputation of knowledge among partners is pure dicta. The court also referred to the imputation rule as a presumption, rather than an irrebuttable conclusion, which undercuts the trustee's case.

*Carstensen v. Gottesburen*, 215 Cal. 258, 9 P.2d 831 (1932). Plaintiffs rented a fishing barge to defendant A, who sold a half interest to B, as a partner with A, in violation of the lease which forbade assignment and subletting. Plaintiffs sued to terminate the lease. Defendants argued (among other things) that the plaintiff had not made a sufficient demand for possession because the plaintiff had made demand only on defendant A, not defendant B. The court said the two defendants were partners and that notice to one of the partners was notice *to the partnership*. Only notice to the partnership was required, and notice to either partner was sufficient for that purpose.

*Zimmerman v. Dan Kamphausen Co.*, 971 P.2d 236 (Colo. Ct. App. 1998). As part of his estate plan, a father formed a partnership with his son and a trust. The father bought property and signed a partnership guaranty of the purchase money debt. The father

-48-

defaulted and the seller sued the partnership and the son for the deficiency. The trial court granted summary judgment in favor of the partnership and the son. The court of appeals reversed. The court held that a partner has authority to bind the partnership and that partners are jointly and severally liable for partnership debts. It was irrelevant that the son had no actual knowledge of the guaranty. (But the court found that there were disputed issues of fact about whether the father had authority to sign for the partnership, whether the guaranty was within the normal scope of the partnership's business, whether the partnership was signing solely as an agent for the trust, and whether the parties intended that the son's assets would be available to the seller.)

*Grossman v. Grenberg*, 619 So. 2d 406 (Fla. Ct. App. 1993). Partners sued other partners for making undisclosed profits on sale of partnership property. The defendant partners argued that the statute of limitations had expired. The court held that the statute was tolled until the plaintiff partners learned of the fraud. The defrauding partners' knowledge of their fraud is not imputed to the other partners because of the fraud. In other words, the language about imputation among partners is dicta, because the court held that other partners did NOT have notice.

*Turner v. Lansing Twp.*, 108 Mich. App. 103, 310 N.W.2d 287 (Mich. Ct. App. 1981). In a tax dispute, the taxpayer (a partnership) claimed that the government did not give proper notice of the assessment. The court quoted statements about the imputation

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 49 of 72

of notice among partners, but the issue in the case was whether the partnership got adequate notice, so the imputation discussion is dicta.

*Sommers v. Hergenreter*, 523 S.W.2d 176 (Mo. Ct. App. 1975). In a proceeding to liquidate a corporation, a partnership filed a timely claim but did not appear at the hearing on the objection to that claim, so the claim was disallowed. The partnership moved to set the disallowance order aside. The partnership did not deny that it had received effective notice, but instead said that internal communication problems were an excuse for its nonappearance. The court discussed the rule of imputation of notice, but because the partnership conceded that it received proper notice, the imputation discussion was unnecessary dicta.

*Affiliated FM Ins. Co. v. Kushner Companies*, 265 N.J. Super. 454, 627 A.2d 710 (N.J. Super. Ch. Div. 1993). A partnership sought insurance coverage for its shopping center. One of its partners requested insurance in May 1988 and obtained a binder on June 27, but effective as of June 17. On June 21, there was a major fire at the center. One or two partners knew of the fire when it happened but did not tell the partner applying for insurance. The insurer claimed that the policy was not intended to cover the fire loss. The parties stipulated that the insurer intended to cover losses occurring between June 17 and 27 of which the insured was unaware. The partnership agreed with the insurer that the *partnership* was aware of the fire before coverage was bound. *Kushner,* 265 N.J. Super. at 459. The court quoted language about imputation among

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 50 of 72

partners, but its holding rested on imputation to the partnership. "The insured entity is the partnership which, I find, based on the reasonable inferences from the evidence, knew of the loss prior to June 27, 1988." *Id.* at 469-70. The discussion of imputation among partners is dicta.

*Mileasing Co. v. Hogan*, 87 A.D.2d 961, 451 N.Y.S.2d 211 (1982). The trustee relies on the court's statements that notice can be imputed from one party to another in certain circumstances, such as if the parties are partners. But the court held "[t]he papers submitted upon this motion, however, wholly fail to detail the relationship between defendants." So there was no basis for imputation on any theory, and the court's comments about imputation among partners are dicta.

*Wiste v. Neff & Co., CPA*, 126 N.M. 232, 967 P.2d 1172 (N.M. Ct. App. 1998). Wiste was a limited partner in a partnership. The IRS audited the partnership's tax returns and sent Wiste a notice of Final Partnership Administrative Adjustment (FPAA) which told her that she had certain deadlines to settle with the IRS or challenge proposed adjustments to the partnership's tax returns. Taxes were later assessed against her and she sued the accounting firm that prepared her tax returns. The accounting firm claimed that the statute of limitations had run. The court held that the claim accrued when she received the FPAA. The court discussed the rules of imputation of notice among partners, but Wiste had received actual, personal notice, so the discussion of imputation is pure dicta.

-51-

*California Bag & Metal Co. v. State Tax Comm'n*, 3 Or. Tax 41 (Or. T.C. 1967). A partnership transferred real property to one of its partners. The county attempted to change its tax rolls retroactively (to a date prior to the transfer to the partnership) to correct a clerical error in the assessments. A statute provided that retroactive adjustments would not bind good faith purchasers. The court held that the partner did not qualify as a good faith purchaser. The court said that, "Notice to or knowledge of a partner with respect to the firm's business is notice to or knowledge of all partners." But the court's holding did not turn entirely on notice:

> Plaintiff's position that he relied in good faith on the tax rolls when he purchased his brother's interest cannot be sustained because he was a co-owner of the partnership property as a tenant in partnership and charged with notice. Under the circumstances of this case a partner purchasing the interest of his other partner cannot contend that he is a purchaser in good faith within the intent of [the tax statute]. To hold otherwise would put plaintiff in a better position with respect to the taxes against the property after the purchase than he was prior to such purchase.

*Id.* at 44-45. This is not really a notice case; the holding is that the partner was not a "purchaser" because he owned an interest in the property all along.

*SREE v. Champaneria*, No. M2004-00613-COA-R3-CV, 2005 WL 2043598 (Tenn. Ct. App. Aug. 24, 2005). An individual agreed to manage a partnership's motel. After a motel guest was murdered, the partnership sued the manager for failure to maintain insurance. The manager asserted a res judicata defense based on the judgment in a prior suit filed by the partnership against the manager. The partnership said he raised this defense too late. The court held otherwise because the partnership had notice of

-52-

the suit which gave rise to the bar. The court said that "[under]the principles of agency, the acts of one partner are binding on all the partners," but the court only needed to make the common-sense observation that a partnership has notice of a suit that *the partnership itself filed*!

*McNeil Pac. Investors Fund 72, Ltd. v. Ernst & Young & BDO Seidman*, 05-94-01527-CV, 1995 WL 447557 (Tex. App. July 28, 1995). In an accounting malpractice case, the statute of limitations was at issue, and the question was when partnerships had notice of certain claims. The court said that the actual or constructive notice of a partner is imputed to the other partners and to the partnerships as a matter of law, but held that *the partnerships* had notice. The court analyzed the knowledge of limited partners without even mentioning imputation. So the holding of the case (as opposed to its dicta) follows the correct view that a partner's knowledge is imputed to the partnership and not the other partners.

*Mid-City Materials, Inc. v. Heater Beaters Custom Fireplaces*, 36 Wash. App. 480, 674 P.2d 1271 (Wash. Ct. App. 1984). Defendants sought to vacate a default judgment, claiming they had not been served. The court of appeals agreed. Personal service had not been made on the moving defendants. Service on other defendants did not suffice. While a partnership may be served through a partner, one cannot take an in personam judgment against a partner without effecting personal service on that partner: "in many situations, while notice to one partner is notice to all, that does not

-53-

mean that service on one partner is such service on all partners that an in personam judgment can be taken against partners not personally served." *Id.* at 485-86. The language quoted by trustee is sheer dicta, and the phrase "in many situations" is telling.

*Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310 (Fed. Cir. 2005). The district court held that a partnership had acted in bad faith in connection with a patent, awarded attorneys' fees against the partnership, and held both partners liable. The court of appeals quoted UPA on imputation of knowledge, but went on to say that, under New Jersey law, "the partnership, or every member thereof, is liable for torts committed by one of the members acting in the scope of the firm business, *although they do not* participate in, or ratify, or *have knowledge* of such torts." *Id.* at 1316 (internal quote marks omitted, emphasis added). Therefore, imputation of knowledge among partners was unnecessary to the court's holding.

*Manufacturers Hanover Trust Co. v. Jayhawk Associates*, 766 F. Supp. 124, 127 (S.D.N.Y. 1991). A lender sued obligors on a refinancing loan. The obligors argued that they were not liable because (among other reasons) the lender had negligently failed to collect from a former general partner. The lender claimed this argument was barred by a general release signed by all of the obligors in favor of the lender at the time of the refinancing. The court also pointed out that at least one of the partners knew that the lender had not collected from the former general partner, and said that this

-54-

knowledge was imputed to the other partners. But because all of the obligors had released all of their claims, the imputation point was unnecessary.

## II.  Right Result, Wrong Reason

Next, there is a category of cases where the court held partners liable on the ground that the knowledge of one partner is imputed to all partners. The court would have reached the same result if it had correctly applied UPA and RUPA: the partnership is liable because the acts of any general partner in the conduct of partnership business are binding on the partnership, and because knowledge of a partner is imputed to the partnership; and the other partners are liable because partners are liable for partnership debts, regardless of the partner's notice or knowledge. Moreover, the partner's notice or knowledge is neither necessary nor sufficient to impose liability on the partner.

*Sun Mortgage Corp. v. W. Warner Oils Ltd.*, 1997 S.D. 101, 567 N.W.2d 632 (S.D. 1997). The Petersons guaranteed a loan and pledged securities they held in a "street name" account with Edward D. Jones & Co. ("EDJ"). A law firm called BAH represented the borrower. Sun Mortgage later made another loan which the Petersons guaranteed. Sun Mortgage was owned by a majority of the partners in BAH, Sun Mortgage shared offices with BAH, and BAH acted as Sun Mortgage's lawyers in connection with that loan. The Petersons pledged securities as collateral for the Sun Mortgage loan, at least one of which they had already pledged to the first lender. An EDJ agent signed an

-55-

acknowledgment that EDJ would not honor any instructions to sell or pledge the securities without the Sun Mortgage's consent. The agent later said he had not seen the acknowledgment and lacked authority to bind EDJ. The Petersons transferred at least one of the securities to another account. The Sun Mortgage loan defaulted, and Sun Mortgage sued EDJ to recover the pledged security. The court dismissed the claims. The court held that one of the partners of BAH had received notice that EDJ had repudiated the acknowledgment, and that his knowledge was imputed to his law partner who in turn was Sun Mortgage's principal shareholder. The court could have reached the same result in a manner consistent with modern partnership law. The court should have said that the lawyer's knowledge was imputed to his law partnership, BAH, and that BAH's knowledge was imputed to the firm's client, Sun Mortgage, because BAH was an agent for Sun Mortgage.

*Bulldog Concrete Forms Sales Corp. v. Taylor*, 195 F.2d 417 (7th Cir. 1952). A creditor sold personal property to a partnership and retained a security interest. The creditor sold the property at foreclosure after giving notice of sale to one of the partners in care of the partnership at the partnership's address. The creditor got a deficiency judgment against all three partners. The partners challenged the deficiency judgment on the ground that they had not gotten proper notice of the sale. The court found that adequate notice was given. Note that the foreclosure statute required only notice to the "buyer," which was the partnership, that UPA says that notice to one partner is notice to the partnership, and that general partners are liable for partnership debts

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 56 of 72

whether or not the partners have notice. In other words, the court did not have to find that the other partners got individual notice.

*Buder v. Denver Nat'l Bank*, 151 F.2d 520 (8ᵗʰ Cir. 1945). Franz was indebted to a bank and was beneficiary of a trust which held certain stock. Gustavus, a lawyer, was trustee of the trust. He and his brother Oscar were partners in a law firm that represented the trust. The bank became concerned that it was undercollateralized. Oscar assured the bank that the trust assets would be distributed soon and that Franz would receive 3,500 shares "clear." Oscar knew that his assurance was false; he knew that Franz had already pledged almost all of his shares (largely to the law firm for fees) and that Franz would not get 3,500 shares clear. When the bank did not get repaid and did not get the 3,500 shares, it sued Oscar, Gustavus, and the law firm. The court of appeals affirmed the judgment against Oscar on the basis of equitable estoppel. The court held Gustavus and the firm liable, holding that Gustavus must have known that Oscar was perpetrating a fraud in the course of the firm's business. The court also said that Oscar's knowledge was imputed to Gustavus as a matter of partnership law, but this was unnecessary because the court said Gustavus "must have known" of the fraud, *id.* at 526, and because Gustavus would have been liable for the law partnership's debts and tort liabilities even if he had no notice. (Also, this case has no precedential value because it did not interpret UPA or RUPA.)

*E. F. Corp. v. Smith*, 496 F.2d 826, 830 (10th Cir. 1974). Shortly before filing a

-57-

bankruptcy petition, the debtor made a transfer to a law firm partnership that was one of its creditors. The court held that the transfer was an avoidable preference and that both partners were liable for it. The court affirmed the finding that one of the partners had reason to know of the transfer and that knowledge was imputed to the other partner. The court also noted, however, that "[t]he proof of claim and the petition for reclamation are in the name of the partnership." In other words, the case could have been resolved without relying on imputation of notice among partners. The first partner's knowledge of the debtor's insolvency is imputed to the partnership, so the partnership is liable for the preference. The other partner becomes liable for the partnership's debt whether he had knowledge or not.

*Scully Signal Co. v. Joyal*, 881 F. Supp. 727 (D.R.I. 1995). In a case involving misappropriation of trade secrets in violation of a contract, the court held that the veil of a corporation should be pierced and its owners treated as joint venturers. The question then became whether all of the joint venturers should be charged with knowledge of the prior confidentiality agreement. The court said that knowledge of one joint venturer is imputed to all others, but also noted that there was a genuine issue of fact as to whether the other partners actually knew of the agreement. In other words, the decision is inconsistent with the trustee's position because it suggests that the imputation of knowledge among partners is rebuttable. Additionally, the discussion of imputation to individual partners was unnecessary because they would have been liable even without imputed knowledge: they were general partners and

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 58 of 72

general partners are liable for the obligations of the partnership.

*Remington Investments, Inc. v. Nat'l Properties, Inc.*, No. CV 910323567S, 1996 WL 614809 (Conn. Super. Ct. Oct. 16, 1996), *aff'd*, 49 Conn. App. 789, 716 A.2d 141 (Conn. 1998). A series of partnerships under common control owned adjacent buildings and land. One of the partnerships agreed to terminate a tenant's lease and acquire its equipment for $15,000. Another one of the partnerships paid the money. The first partnership then leased the same premises and equipment to another tenant. The first partnership's building was subject to a mortgage. The first partnership defaulted and gave a deed in lieu of foreclosure to the lender. The tenant offered to buy the equipment and a dispute arose about whether the proceeds of sale belonged to the first partnership or to the partnership that paid for the equipment. The court held that each of the partnerships and their respective partners had knowledge of and were bound by the acts of the partner who carried out the transaction. The court did not explain why the knowledge of the other partners was relevant. A general partner has authority to bind the partnership to a contract, regardless of the knowledge or lack of knowledge of the other partners. The court could have relied solely on the partner's authority and omitted any discussion of imputation of knowledge.

*Mobil Oil Corp. v. Hurwitz*, 63 Ill. App. 3d 430, 380 N.E.2d 49 (Ill. 1978). Prehn, a corporation, leased a portion of its land to Mobil Oil for a gas station, and promised not to lease land for another gas station within a certain radius. Prehn subleased

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed 07/11/14  Page 59 of 72

another portion of its land, within the radius, to a corporation, which assigned the sublease to a joint venture, which in turn sought to open a gas station. Mobil sued to enforce the restrictive covenant. The trial court held that one of the joint venturers had actual knowledge of the restriction and his knowledge was imputed to the other joint venturer. The appellate court affirmed, using the language about imputation quoted by the trustee. The appellate court also said that the founders of the joint venture "had actual knowledge of the restriction at the time of forming the joint venture." Imputation among partners was unnecessary; imputation to the partnership was sufficient.

*Brooks v. Davis*, 294 Mass. 236, 1 N.E.2d 17 (Mass. 1936). Around the time of the 1929 stock market crash, Brooks delivered $100,000 of bonds to Castle. Castle promised to use the bonds as collateral for a stock market operation, to return the bonds unsold, and to split the profit with Brooks. Castle then delivered the bonds to Blake Bros. & Co., a partnership that operated a stock brokerage, where Castle had personal accounts. Blake Bros. later sold the bonds to satisfy a margin debt owed by Castle. Brooks sued Castle and Blake Bros. for return of the bonds. An auditor appointed by the trial court found that one of the partners of Blake Bros. knew that Brooks, not Castle, owned the bonds, and that Castle could not use the bonds as collateral for his own account. The court said that the partner's knowledge was imputed to all of the other partners of Blake Bros. The court apparently assumed (without discussion) that it was necessary to prove knowledge of all parties, but this is

-60-

not correct. The partnership was liable for its partners' wrongful acts (essentially conversion of Brooks' bonds) in the course of partnership business, and the partners are liable for the partnership's torts whether or not the partners have notice. Further, the court's imputation discussion relied on a pre-UPA case from 1913. Thus, it has little precedential value for interpreting UPA.

*Hilco Prop. Servs., Inc. v. United States*, 929 F. Supp. 526, 541-42 (D.N.H. 1996). A dispute about lien priority turned on which of two conveyances of land was valid: a 1984 inter vivos conveyance from a mother to one of her sons; or a 1986 testamentary transfer of the same property to a partnership of all of the mother's children. The court held that the children were estopped from denying the validity of the 1986 transfer, partly because the acts of one of them as partner were imputed to the others and the partnership, but also because each child had individually signed conveyance documents premised on the validity of the 1986 transfer and had actual knowledge that their mother was incompetent when she signed the 1984 conveyance. The statutory language the court cites does not support a theory that a partner's knowledge is imputed to co-partners. It mere explains that co-partners are jointly and severally liable for the acts of their partners because they are general partners. Thus, the result would have been the same even absent the imputation of knowledge among partners.

*Cameron v. Fenton*, 169 Ark. 372, 275 S.W. 743 (Ark. 1925). Waldrop sold Fenton the

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 61 of 72

right to log a parcel of land until a date certain. Waldrop later agreed with Fenton's successor to extend the terminal date. Waldrop then sold the land to a partnership, expressly subject to the original, unextended contract. The question was whether Fenton's right to log the land during the extended period was enforceable against the buyer of the land. The trial court found that the land buyer knew of the timber buyer's rights because Waldrop showed the contracts to Hooten, one of the partners. The court said that "notice to one partner is notice to all *and binds the firm*. Therefore, notice to Hooten of the rights of Fenton in the extension contract amounted to notice to all the partners and bound them all." (Emphasis added.) It is significant that the court used the terms "the firm" and "all the partners" interchangeably. This illustrates the confusion existing when the case was decided (1925) between the aggregate and entity theories. Under the entity theory, Hooten's knowledge of Fenton's extended rights would be imputed to the partnership, and the extension would be binding on the partnership regardless of the other partners' knowledge. Further, this case has little precedential value because the court did not cite UPA, and it is not clear that Arkansas adopted UPA by 1925.

*Howard v. Hamilton*, 28 N.C. App. 670, 222 S.E.2d 913 (N.C. Ct. App. 1976). Two partners, apparently acting on behalf of a limited partnership, sued a law firm for fraud and negligence for failing to disclose a debt of the partnership. The law firm argued that the three year statute of limitations had run. The court found that the general partners knew the relevant facts more than three years before the action was

-62-

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 62 of 72

filed, and that the general partners' knowledge was imputed to the limited partners. The court also cited a document signed by most of the partners in which *they personally guaranteed the debt of which they claimed to be unaware*. Thus, most of the partners had actual knowledge of the claim, their knowledge was imputed to the partnership, and imputation to the other partners was unnecessary.

## III. Reversed or Overruled

In the following cases, the language quoted by the trustee appears in a lower court decision that was reversed on appeal or overruled by a subsequent decision.

*Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 650 F. Supp. 1378 (W.D. Va. 1986), *aff'd*, 840 F.2d 236 (4th Cir. 1988). Eighteen of the 23 partners in a general partnership sued corporations and individuals involved in setting up the partnership and its business, alleging securities law violations. The defendants argued that the claims were barred by a settlement agreement and release signed by the partnership and all of the partners. The partners alleged that they had not read the document and had been misled about its meaning. The court held that the general partnership interests were not "securities" and that, even if they were, the release barred the claims. The partners' alleged failure to read the release is not a defense and even if it were, some partners did read the release and their knowledge of the release's terms is imputed to the other partners.

> Because the knowledge of the contents of the release is imputed to all plaintiffs, and because plaintiffs failed to read the release before signing

-63-

it, the court concludes as a matter of law that any misrepresentations made by defendant . . . do not vitiate the effect of the Mutual Release Agreement.

*Id.* at 1387.

The trustee fails, however, to address the decision of the court of appeals in the same case. That court affirmed the decision that the partnership interests were not "securities." The court also said that the district may not have, and should not have, addressed the state law fraud claims or the validity of the release:

> We interpret the district court's concluding statement that "it is unnecessary to consider the pendent claims" . . . as meaning it declined to exercise jurisdiction over those claims. Therefore, despite the court's obiter dictum concerning the validity of the release with respect to "all the substantive claims raised by the parties," . . . we find that its dismissal of the state law claims was not a dismissal on the merits.

*Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 243 (4th Cir. 1988). The court emphasized this in a footnote: "Because our holding with respect to the proper characterization of appellants' general partnership interests is dispositive of the court's dismissal of the federal claims, it is unnecessary to consider the validity of the Mutual Release Agreement." *Id.* at 243 n. 12. In other words, the appellate court said that the trial court did not decide, and certainly should not have decided, the issue which prompted the trial court's comments about imputation among partners. In light of the appellate ruling, the trial court's statements quoted by the trustee have no precedential value.

*Impulsora del Territorio Sur, S.A., v. Cecchini (In re Cecchini)*, 780 F.2d 1440 (9th Cir. 1986). A partnership of three individuals agreed to induce tourists to stay in the plaintiff's

-64-

hotel. The plaintiff agreed to reimburse the partnership for certain of its expenses. Two of the partners decided that the plaintiff was not providing adequate reimbursement, so they diverted funds to themselves that were supposed to go to the plaintiff. The plaintiff learned of the diversion and sued the two partners. They entered into a stipulated judgment in favor of the plaintiff, and several years later filed bankruptcy petitions. The plaintiff sought a determination that the partners' liability was nondischargeable because it was the result of a willful and malicious injury, 11 U.S.C. § 523(a)(6). The Ninth Circuit first interpreted section 523(a)(6) in a manner that the Supreme Court later overruled in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). *See Peklar v. Ikerd (In re Peklar)*, 260 F.3d 1035, 1037-38 (9th Cir. 2001). The court went on to hold that both partners' debts to the plaintiff were nondishargeable because the partner who converted the funds did so on behalf of the partnership.

The overruling of the primary holding of the case casts doubt on its subordinate propositions. Further, although the court cited UPA, it did not explain why it failed to follow the plan language of UPA.


*U.S. Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437 (D. Kan. 1990), *aff'd*, 999 F.2d 489 (10th Cir. 1993). This case involved whether an insurance policy covered the cost of remediating a hazardous waste site. The insured was a partner in a joint venture which had illegally disposed of hazardous pesticides and fertilizers. The policy excluded coverage for pollution claims other than those resulting from a "sudden and accidental" discharge or release. The insured argued that, from its

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 65 of 72

perspective, the release was sudden and accidental because it did not know that the joint venture had buried the drums. The court held that the release was not "sudden and accidental" for three independently sufficient reasons:

> To summarize, this court first holds that the evaluation of "sudden and accidental" should be made objectively from the circumstances surrounding the actual release or discharge of the pollutants. Alternatively, the term "sudden" is objectively defined, and the release must be sudden irrespective of the viewpoint advocated. Finally, an insured's viewpoint for purposes of the pollution exclusion includes the position and knowledge of the insured's partner or joint venturer. Defendant's claims for insurance coverage are barred by the pollution exclusion.

*Id.* at 448-49. The appellate court's decision, which the trustee fails to mention, held only that "sudden and accidental" is unambiguous and has "an objective temporal meaning." Because the release happened over a long period, it was not "sudden." The precedential effect of the trial court's statements about imputation were weak to begin with because they were only one of three independent grounds for the decision. The fact that the appellate court did not rely on those comments weakens them further.

## IV.    Multiple Alternative Grounds

In the following cases, the court relied on the imputation of knowledge among partners as only one among several independently sufficient grounds for the result. The discussion is not technically dicta. But, because the discussion is inconsistent with the plain language of RUPA and UPA and with modern partnership theory, and because the result would have been the same if the court had not discussed

-66-

imputation, the reasoning based on imputation should be given little if any precedential weight.

*National Credit Union Admin. Board v. Stone*, 1994 WL 175044 (D. Mass. April 21, 1994). The conservator of an insolvent credit union sued a law firm that had represented the credit union, and some of its attorneys, for malpractice. One of the firm's partners, Stone, had also served as a director and officer of the credit union and an affiliate. The defendants moved for summary judgment on the ground that their only legal services had been as closing attorneys and that they had not committed malpractice in that limited role. The court held that there was enough evidence to preclude summary judgment in favor of Stone based on his own testimony of his broad involvement in the credit union's legal affairs. The court also denied summary judgment to Stone's law partners for two reasons: first, "[f]or the purposes of summary judgment, Stone's knowledge in his capacity as a director is inseparable from that in his capacity as attorney" and was imputed to his law partners; and second, there was evidence that the other attorneys' services were not as limited as they claimed. Thus, the court's decision did not rest only on imputation.

*FDIC v. Braemoor Assoc.*, 686 F.2d 550 (7th Cir. 1982). A bank president funneled money, in breach of his fiduciary duty to the bank, to a joint venture (via third parties) of which he was a partner. FDIC sued to recover the money from the other joint venturers. The district court dismissed the case, finding that FDIC failed to

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed 07/11/14  Page 67 of 72

show that the other venturers knew or should have known of their partner's breach of fiduciary duty. The court of appeals held that this was an unnecessary finding for two reasons. One, notice to one partner is notice to all. Second, general partners are liable for partnership tort liabilities regardless of notice.

> So we need not consider whether the district court, treating this as if it were a case where the breaching trustee and the constructive trustee were strangers rather than partners, was correct in concluding as a matter of fact that the joint venturers lacked knowledge of such facts as would have led reasonable men to inquire further into whether Paul Bere was committing a breach of trust-though we shall not conceal our skepticism that Lambert Bere did all that a reasonable man should have done to inquire into the circumstances whereby $417,000 passed mysteriously in and out of his bank account in a space of days. *The liability of the joint venturers under the Uniform Partnership Act is independent of their knowledge-whether actual or, under general principles of restitution, constructive-of Paul Bere's breach of trust.*

*Id.* at 557-58 (emphasis added). The liability of general partners for partnership debts under UPA, regardless of notice, is an independently sufficient ground for the court's decision. Whether the other partners had knowledge was irrelevant to whether they could be held liable.

*In re Anderson*, 330 B.R. 180 (Bankr. S.D. Tex. 2005). The debtor objected to a lender's proof of claim and gave notice to the lender by mail at the address listed in proof of claim. The lender did not respond or appear at the hearing, and the court sustained the claim objection. Later, the lender moved to vacate that order, claiming lack of notice. The court held that notice mailed to the address stated in the proof of claim was sufficient. In addition, the court found that another attorney in the law firm

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed  07/11/14   Page 68 of 72

representing the lender had notice of the plan confirmation hearing that was set at the same date and almost the same time, and the notice to the other attorney was notice to her law colleague.

> Thus, Movant had two chances to appear in court at the hearing on June 20. Its first opportunity was through notice sent directly to it regarding the hearing on the Objection to Proof of Claim. The second was through notice to its counsel with respect to the confirmation of the Debtors' Plan. Consequently, this Court finds that notice was sufficient and that due process was accomplished in terms of notice.

*Id.* at 188. Because the lender got proper notice directly, the statements about notice through counsel were an unnecessary (and incorrect) backup.

N. *Peachtree I-285 Properties, Ltd. v. Hicks*, 136 Ga. App. 426, 221 S.E.2d 607 (Ga. 1975). A limited partnership borrowed money to finance its purchase of real property. All general and limited partners personally guaranteed repayment of the loan. When the loan was not repaid, the lender got summary judgment against all partners. On appeal, the partners argued that the seller had falsely warranted that the property was subject to no land use restrictions other than zoning, and that this fraud barred enforcement of the guaranties. The appellate court rejected this argument, stating that there were no warranties, that even if there were warranties the defendants did not rely on them, that the alleged warranty was not breached, and that "an engineering firm employed by defendants" checked out the property thoroughly, so the defendants were not misled.

> Even if plaintiff's representations were warranties, and were made prior to the contract for sale, defendants knew the correct zoning and approximate size of the flood plain before going to closing and either

-69-

> were not misled by such representations or with knowledge of the true
> facts affirmatively discarded such representations.

*Id.* at 431. The imputation discussion was one of multiple independent grounds for the court's decision. This case has limited precedential value because its imputation discussion relied on two pre-UPA cases. One was from 1853, and the other was from 1907. Thus, if Georgia was a UPA state in 1975, the court did not rely on the plain language of the statute in its imputation discussion.


*Fightmaster v. Leffler*, 556 S.W.2d 180 (Ky. Ct. App. 1977). A widow transferred inherited property to a man so he could help her sell it. He transferred it to a partnership of which he was a partner and then to a two-man corporation of which he was a stockholder. He kept the proceeds for himself. The widow sued the partners to recover her property. The trial court held that the other partner lacked actual or constructive notice of the fraud. The court of appeals reversed, citing the UPA sections on notice to a partner being notice to the partnership, the partnership being bound by a partner's act in the ordinary course of partnership business, and the partnership being bound by a partner's breach of trust in the course of partnership business, and partners being liable for partnership obligations. "Thus it is clear that one partner is bound by the knowledge of another, bound by his wrongful and fraudulent act, bound by his breach of trust." Imputation of knowledge among partners was only one of three independently sufficient grounds for liability. Partner-to-partner imputation was unnecessary because general partners are liable for obligations of the partnership.

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed  07/11/14  Page 70 of 72

## V.    Imputation as Only Evidentiary

The following case suggests that, contrary to the trustee's position, the imputation of knowledge is not conclusive, but rather can be considered in making a factual determination of the person's actual knowledge.

*Morgan v. Francois*, 2006 WL 3032162 (E.D. Mo. Oct. 19, 2006). An employee sued an employer for failing to pay overtime in violation of Fair Labor Standards Act (FLSA). FLSA has a two-year statute of limitations, but a three year statute for willful violations. As evidence of willfulness, plaintiff pointed to defendant's business partner's statement that he knew that hourly employees were entitled to overtime. The court held that issues of fact precluded summary judgment for employer. The imputation of knowledge from the partner plus the employer's failure to keep accurate records might support a jury finding of wilfullness, but the employer's reliance on counsel might support the opposite result. The case contradicts the trustee's position because it suggests that the imputation of knowledge among partners is not conclusive but rather can be rebutted by contrary evidence.

This court cited UPA, but it did not explain why it deviated from the plain meaning of the statute when it reasoned that there is partner-to-partner imputation. Additionally, the case it cited in support of the imputation theory, *Bruder v. Denver National Bank*, 151 F.2d 520 (8th Cir. 1945), did not mention UPA. *Bruder* was a Minnesota case quoting pre-UPA, Missouri law. Minnesota never adopted UPA, and

U.S. Bankruptcy Court - Hawaii  #12-90009  Dkt # 162  Filed 07/11/14  Page 71 of 72

it is not clear that Missouri adopted the UPA either.[120] At best, it adopted UPA in 1949, four years after *Bruder*.[121] Therefore, this case has no precedential value on how to interpret UPA.

---

[120] Uniform Partnership Act (1914) References and Annotations.

[121] According to the Uniform Partnership Act (1914), Missouri adopted UPA in 1949. *Id.* However, according to the Uniform Law Commission's website, Missouri never adopted UPA. Partnership Act (1914), National Conference of Commissioners on Uniform State Laws, http://www.uniformlaws.org/Act.aspx?title=Partnership%20Act%20(1914) (last visited July 10, 2014).

U.S. Bankruptcy Court - Hawaii   #12-90009   Dkt # 162   Filed 07/11/14   Page 72 of 72